UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**MARVIN THOMAS SHOEMAKER, II**,                Case No. 6:14-CV-01220-KI

               Plaintiff,                OPINION AND ORDER

     v.

**CAROLYN W. COLVIN**,
Acting Commissioner of Social Security,

              Defendant.

      Kathryn Tassinari
      Robert Baron
      Harder, Wells, Baron & Manning, P.C.
      474 Willamette, Suite 200
      Eugene, OR 97401

          Attorneys for Plaintiff

      Billy J. Williams
      Acting United States Attorney
      District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97201-2902

Benjamin J. Groebner
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Marvin Thomas Shoemaker, II, brings this action pursuant to section 205(g) of
the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final
decision of the Commissioner denying plaintiff's application for disability insurance benefits
("DIB") and supplemental security income benefits ("SSI"). I affirm the decision of the
Commissioner.

## BACKGROUND

Shoemaker filed applications for DIB and SSI on June 2, 2010, alleging disability as of
February 28, 2008. The applications were denied initially and upon reconsideration. After a
timely request for a hearing, Shoemaker, represented by counsel, appeared and testified before an
Administrative Law Judge ("ALJ") on September 20, 2012.

On October 5, 2012, the ALJ issued a decision finding Shoemaker not disabled within the
meaning of the Act and therefore not entitled to benefits. This decision became the final decision

Page 2 - OPINION AND ORDER

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

June 21, 2014.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance.  Id. (internal quotation omitted).  The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations.  Id.

## THE ALJ'S DECISION

The ALJ found Shoemaker to have the following severe impairments:  degenerative disc disease of the lumbar spine, left knee medial meniscus tear, chronic shoulder pain due to A.C. separation, obesity, social phobia, depression NOS versus dysthymia, and avoidant personality disorder.  The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ concluded Shoemaker can perform light work as follows:  he can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; he can stand and walk about four hours in an eight-hour day, but only 15 minutes at a time; he needs to be off his feet an equal amount of time before standing and walking for another 30 minutes; he can sit six hours in a day so long as he can shift at will.  In addition, he can climb ramps or stairs frequently; he can climb ladders, ropes, or scaffolds occasionally; he can crawl frequently; he can only occasionally kneel or crouch; and he cannot work above shoulder level with his right upper extremity.  With respect

to mental impairments, he cannot work with the public or work closely with co-workers; i.e., he cannot perform tasks as part of a team. He works best in a setting that is free of interaction with the public or co-workers. Due to anxiety symptoms, he is limited to interacting in close vicinity with no more than two or three other people. He can perform simple, routine tasks.

Given this residual functional capacity ("RFC"), Shoemaker is precluded from performing his past work. However, he can perform work as a folder, sorter, and electronics worker.

## FACTS

Shoemaker was 21 years old on his alleged date of disability. He obtained his GED at 16 years old. He began working at age 17. He was a watchman at a logging site for one summer before he was laid off. For a few years, he worked with his father performing snow plowing and excavation work for a property maintenance company. He lost the job as a result of a falling out with his boss. After that, during the summer of 2009, he babysat a friend's older children a couple of days a week for a few months.

The earliest medical note in the record is from December 2008 when Shoemaker established care at Umpqua Community Health Clinic. Shoemaker reported falling through snow and hurting his left knee in February of that year. He also reported low back pain and anxiety in social situations. At that time, he weighed 338 pounds (at 5' 10"); he reported previously weighing 500 pounds. The provider described Shoemaker as "pleasant. Interacts easily. Has own health maintenance beliefs and despite attempts to inform I am quite certain that he will not implement any of my suggestions but will continue as in past." Tr. 359. The provider prescribed

Cymbalta for Shoemaker's depression and anxiety, and Tylenol and ibuprofen for the low back and left knee pain.

An x-ray was scheduled of Shoemaker's knee and back in March 2009. At that time, Shoemaker described feeling depressed and anxious in social situations. The provider prescribed Celexa. Shoemaker refused counseling. He was encouraged to lose weight. X-rays revealed no significant lumbar spine or left knee abnormalities. Shoemaker's mood was stable in April; he was taking BuSpar for social anxiety and his left knee pain was believed to be an ACL injury. He was given an exercise program. At his May appointment, Shoemaker said the BuSpar for social anxiety worked well; he asked for an MRI of his knee. The MRI revealed a lateral meniscus tear and a large Baker cyst. In July, Shoemaker declined further treatment for his depression beyond the BuSpar. He inquired about medical marijuana for his knee pain.

Alternative Medicine Outreach Program prescribed marijuana for Shoemaker's left knee pain and depression in August 2009. Shoemaker also smoked cigarettes.

Shoemaker sought an MRI for his lumbar radiculopathy, but the physical examination performed by Charles Ross, D.O., in December 2009 revealed "[n]o focal deficits, cranial nerves II-XII grossly intact, normal sensation, normal reflexes, normal coordination, normal muscle strength, normal tone. Pt ambulates without difficulty up and down the hallway." Tr. 375. Dr. Ross told Shoemaker an MRI was not warranted and Shoemaker left upset.

 Shoemaker did not seek care again until almost a year later, in September 2010. He established care at the Umpqua Regional Medical Center for his back pain. After a normal examination, and review of the x-ray, Faiza Salman, M.D., declined to order an MRI and advised Shoemaker to lose weight. He weighed 361 pounds. He left upset.

Page 7 - OPINION AND ORDER

Shoemaker returned in October complaining of neck and knee pain, as well as anxiety. He reported that due to lack of health insurance, no orthopedic would see him. Dr. Salman gave him a trial of Vistaril for his anxiety, advised him to lose weight, referred him to an orthopedist for his knee, and ordered an x-ray of his cervical spine. The x-ray revealed no narrowing, misalignment or osteophyte formation. Tr. 381.

A few weeks later, Ravi Kalidindi, M.D., diagnosed lumbar radiculopathy and noted Shoemaker's pain seemed be more exacerbated than the physical findings.

At the request of Disability Determination Services, G. William Salbador, M.D., examined Shoemaker on October 29, 2010. Dr. Salbador described Shoemaker as disheveled, with a strong smell of body odor, and angry, agitated and defensive when initially invited into the examination room. Shoemaker settled down after 10 or 15 minutes, displaying cooperation, attention and interest although he did not make eye contact with Dr. Salbador. He had good short-term memory, was able to do serial 7s backward, could spell "world" forward but not backward, and could follow a three-step command without trouble. Dr. Salbador speculated about the role Shoemaker's heavy marijuana use played in his overall mental health, although the doctor commented Shoemaker reported anxiety prior to smoking marijuana. Dr. Salbador diagnosed Generalized Social Anxiety Disorder, Depression, NOS, Rule out cannabis-induced Anxiety Disorder, and Avoidant Personality Disorder. He assigned a Global Assessment of Functioning score of between 40 and 45.[1] Finally, Dr. Salbador opined that Shoemaker's

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 indicates "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a

(continued...)

prognosis was "fairly guarded . . . based on severity of his symptomology.  There is definitely the possibility for an improved prognosis if he were to have comprehensive psychiatric evaluation and treatment, as well as complimentary psychotherapy."  Tr. 392.

A few weeks later, Anthony Glassman, M.D., examined Shoemaker also at Disability Determination Services' request.  He limited Shoemaker to walking and standing no more than four hours in any day, or a half hour at any given time without a ten minute break, due to Shoemaker's chronic knee and low back pain.  He found Shoemaker capable of lifting 50 pounds occasionally and 35 pounds frequently.

Shoemaker obtained an MRI of his lumbar spine in February 2011 which reflected a large disc extrusion at L5-S1, some dessication of the L4-L5 disc, and some degeneration at the L3-L4 level.

That same month, Judith Eckstein, Ph.D., evaluated Shoemaker.  Shoemaker was prompt and cooperative, although he made poor eye contact and mumbled at times.  He smelled strongly of marijuana.  He described feeling panicky around more than two people.  A few tests indicated his cognitive skills were in the average range, although Dr. Eckstein felt he had trouble concentrating and would likely lose focus in less structured situations.  He was not taking the prescribed Citalopram as he did not find it to be helpful and, as a result, Dr. Eckstein felt a psychotropic medication evaluation would be warranted.  She also believed working around

---

[1](...continued)
job)."  The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. 2000) ("DSM-IV").  The most recent edition of the DSM eliminated the GAF scale.  <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2012).

others would be "an enormous challenge" for Shoemaker.  She diagnosed Social Phobia,

Dysthymia, and assigned a GAF of 52.[2]

Shoemaker was back at the Umpqua Community Health Clinic in March 2011.  Since

Shoemaker could not afford a referral to neurosurgery, Michelle Jones, N.P., discussed chronic

pain management options with him and prescribed Percocet.  The next month, Shoemaker

reported that the Percocet enabled him to engage in activities; he had gone fishing the other day.

Similarly, at his May appointment, Shoemaker thought the pain medication was working.  In

August, Shoemaker told Jones the medication only took the edge off and his pain was worse

when he sat.  He also reported feeling depressed and irritated around people.  The nurse

prescribed Clonazepam for these symptoms and referred Shoemaker for a mood evaluation.  She

encouraged him to quit or cut back on his one-pack a day smoking habit.

At a September mental health appointment, Shoemaker described a life long history of

impaired social functioning.  Nathaniel Holt, PMHNP, noted the absence of eye contact and

facial expressions, narrow interests in his plants and individual musical artists, and lack of

normal peer relationships.  Holt diagnosed Asperger's Disorder.  Shoemaker reported using 3.5-7

grams of marijuana a day.  At his two-week follow up, Shoemaker described his mood as "all

right"; he was cooperative, demonstrated appropriate grooming and hygiene, displayed logical

and connected thought processes, but his affect was restricted.  A month later, at his November

2011 appointment, Shoemaker reported "continued generalized anxiety with worsening of

symptoms secondary to social exposure with somatic complaints of hand and leg tremors[.]"  Tr.

---

[2]A GAF of 51-60 indicates "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 34.

439.  The Klonopin was ineffective.  He was using 3-8 grams of marijuana per day for anxiety. Holt replaced the Klonopin with propranolol.

At his November appointment with Jones, Shoemaker described feeling pain from his neck to his hips; he wanted an MRI.  Jones questioned whether Shoemaker's diagnosis of Asperger's had anything to do with his pain.  She agreed to refer Shoemaker for an MRI. Imaging revealed dessication at L3-L4 and L4-5, disc herniation with impingement on the thecal sac at L5-S1, and desiccation at T5-6.

Holt treated Shoemaker that month for continuing anxiety, which had worsened due to the medical imaging process; Shoemaker was unable to complete the MRI of his cervical spine. Shoemaker reported the propranolol did not work, and Holt replaced it with Ativan (lorazepam). Shoemaker was cooperative, but displayed poor hygiene and grooming and failed to make eye contact.

However, when Shoemaker saw Holt in January 2012, Shoemaker reported improvement in his anxiety levels and improvement in social isolation and avoidance.  He displayed appropriate grooming and hygiene at this appointment.  When Shoemaker met with Jones in February, he reported a willingness to see a neurosurgeon in Portland and discussed financial aid options.

When Shoemaker met with Holt in April, Shoemaker reported "continued good control of anxiety with prn medication.  Notes continued social isolation most days of the week with some commitment to public exposure. . . . Demonstrated limited motivation to change problematic health habits."  Tr. 509.  Holt commented Shoemaker remained morbidly obese with limited

motivation to exercise or to change habits.  At his April appointment with Jones, the nurse noted

Shoemaker had started physical therapy twice a week.

Shoemaker saw Dr. Eckstein again in June 2012.  Dr. Eckstein reported little had changed

in Shoemaker's living conditions or in his psychological status.  Shoemaker informed Dr.

Eckstein that the Portland neurosurgeon cancelled his appointment, perhaps due to Shoemaker's

lack of money, weight issues, and smoking.  He also informed the doctor that he was taking 15

mg of  Oxycodone four times a day, and lorazepam as needed to help with his social anxiety.  He

was cutting back on his marijuana use as he had received notice from the clinic that he would

have to discontinue its use in order to retain his narcotic prescription.  He continued to smoke a

pack of cigarettes a day.  He spent his days with his father (who also received disability benefits),

tended to his marijuana plants, and played with his dogs.  He showered every two weeks because

he did not have the interest or ambition to shower more.  He still weighed 350 pounds.  Testing

revealed a Full Scale IQ score of 70 points, placing him at the cut-off for mild mental retardation.

Dr. Eckstein found it unusual that Shoemaker's working memory scores were much stronger than

his other test scores, and he displayed fairly good arithmetic skills.  His processing speed was

extremely low and he had weak perceptual skills.  He needed repeated instructions to understand

tasks.  Dr. Eckstein thought Shoemaker would have trouble performing tasks in a timely manner

or understanding simple directives.  He would also be unable to tolerate much contact with peers

or supervisors.  She assigned a GAF of 45 and completed a Mental Residual Function Capacity

Report identifying several areas of marked impairment.

At his July appointment with Holt, Shoemaker confessed to taking double the prescribed

anti-anxiety medication (lorazepam) because he had been waking up in a bad mood due to the

heat.  Holt refused to refill the prescription early when Shoemaker's "stated problem of increased

anxiety [was due to] 'the heat'[.]"  Tr. 500.  Shoemaker became upset and refused to discuss

alternatives.  Shoemaker also expressed anger at the clinic's new requirement that patients

choose between medical marijuana and prescription opiates.  Shoemaker left the appointment

early saying he would get his needs met elsewhere.

About a week later, Shoemaker saw Jones again and told her he had decided to continue

pain medication and stop marijuana use.  He had finished his course of physical therapy but

thought it had not helped his pain level.  He declined medication for depression and did not

believe his pain levels affected his depression.  Jones thought Shoemaker would benefit from

Cymbalta, but he refused to discuss it.

At his August appointment with Jones, Shoemaker reported the same pain levels and

activity restrictions, but confirmed he was no longer using marijuana.  Just before his hearing,

Shoemaker continued to report back pain to Jones.

## DISCUSSION

I.    <u>Medical Evidence</u>

The ALJ did not fully credit Dr. Eckstein's assessment of Shoemaker.  Specifically, he

pointed out that the Mental Residual Functional Capacity form Dr. Eckstein filled out consisted

of a check the box form which did not offer a choice that would fall between "no significant

limitation" and "seriously interferes with."  Additionally, Dr. Eckstein reduced the GAF score

from 52 to 45 despite remarking that Shoemaker's situation remained unchanged.  Dr. Eckstein

also reported Shoemaker had not attended counseling, had not engaged in any "interpersonal

activities," and had failed to take his psychotropic medications.  She also failed to consider

whether Shoemaker's marijuana use affected his processing speed. Overall, the ALJ felt, "Dr. Eckstein's second exam seemed less impartial and more apologetic for claimant's poor efforts to seek any treatment for psychological issues. This is all more consistent with moderate limits at most, not the marked limits reported in her check the box form." Tr. 38. The ALJ determined an RFC controlling Shoemaker's social interactions and limiting him to simple, routine tasks accurately captured Shoemaker's impairments as reflected in the medical record, work history, and testimony.

Shoemaker asserts the ALJ failed to give either clear and convincing reasons or even, if applicable, specific and legitimate reasons for only partially crediting Dr. Eckstein's opinion. First, the ALJ gave no reason for his failure to discuss Shoemaker's IQ score and the doctor's related diagnosis of cognitive disorder with borderline intellectual functioning. He also failed to recognize that the doctor's conclusions about Shoemaker's "marked" impairments were supported by her extensive written report. With regard to the drop in GAF score, Shoemaker provides a letter from Dr. Erickson responding to the ALJ's reasoning in which she explained she lowered the GAF score due to Shoemaker's newly revealed low IQ. As for Shoemaker's failure to obtain psychotherapy, Shoemaker notes he stopped taking citalopram because it was not helping him, Dr. Eckstein recognized his depression kept him from obtaining help, and that he was not a good candidate for it in any event due to his lack of motivation for treatment.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may

only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart,

454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another

physician, the ALJ may not reject the opinion without providing specific and legitimate reasons

supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at

1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial

evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066

n.2.

      Since the state agency psychological consultants' opinions, which on the whole identified

only moderate or insignificant limitations, contradicted Dr. Eckstein's conclusions about

Shoemaker's functional limitations, the ALJ was required to give specific and legitimate reasons

for rejecting Dr. Eckstein's opinion.[3]

      The Commissioner does not explain why Shoemaker's failure to obtain psychotherapy or

take prescribed psychotropic medications is a legitimate reason to question Dr. Erickson's

opinion.  While an ALJ may discredit a medical opinion based on properly discredited subjective

statements made by the claimant, and lack of treatment is one proper means of discrediting such

statements, Dr. Erickson did not base her opinion on Shoemaker's subjective statements.  She

based it on testing and observation.

---

     [3] I disagree with Shoemaker that Dr. Salbador and the state agency reviewing
psychologists' opinions do not directly conflict with Dr. Eckstein's opinion since they did not
know about the IQ results.  His argument suggests I should speculate that these other opinions
would have been different had the doctors known about Shoemaker's IQ.

Further, no doctor attributed Shoemaker's cognitive difficulties to marijuana use. Dr. Salbador questioned whether Shoemaker's anxiety might be associated with marijuana use, but did not discuss any processing speed delays. On this record, the ALJ's reason is not specific and legitimate.

The ALJ's failure to discuss Shoemaker's IQ score and Dr. Eckstein's diagnosis of cognitive disorder with borderline intellectual functioning in the context of assessing Dr. Eckstein's opinion is surprising. Nevertheless, the ALJ "specifically considered" Shoemaker's borderline intellectual functioning at step 3 and limited him to simple and routine tasks.

Additionally, the remaining reasons the ALJ gave are sufficient. The ALJ's characterization of Dr. Eckstein's opinion as a "check the box" type, unsupported by findings in her accompanying report, is partially accurate. For example, the form defines "markedly limited" to mean precluding the ability to perform the activity regularly and on a sustained basis, but nothing in Dr. Eckstein's narrative report supports her check the box opinion that Shoemaker's impairments "preclude[]" him from maintaining attendance, being punctual, completing a normal workday, or asking simple questions and requesting assistance; indeed, he was prompt for his evaluation, cooperative, and asked for help while undergoing testing.

Similarly, the ALJ's interpretation of Dr. Eckstein's narrative report to support only moderate impairments, and not the marked impairments reflected in the check the box form, is reasonable. For example, the doctor described Shoemaker as having difficulty understanding instructions "at times" and concluded he would have trouble understanding simple directives "at times." These observations are not consistent with her opinion that such intermittent difficulties would "seriously interfere[]" with Shoemaker's ability to remember, follow, and carry out short

and simple instructions.  Thus, the ALJ's speculation that Dr. Eckstein may have chosen

something less than "seriously interferes with" had she been given the option is a legitimate one.

The ALJ's questioning of Dr. Eckstein's lowered GAF score is also a specific and

legitimate reason to give less weight to the doctor's opinion.  Shoemaker now provides a letter

from Dr. Eckstein responding to the ALJ's reasoning in which she explains she lowered the GAF

score due to Shoemaker's newly revealed low IQ.  This was not information the ALJ had at the

time of his decision nor was it apparent from Dr. Eckstein's report.  Thus, this was a specific and

legitimate reason for the ALJ to question Dr. Eckstein's opinion.

As for Dr. Eckstein's opinion that it would be unlikely Shoemaker could perform tasks in

a timely manner, an RFC limiting Shoemaker to simple and routine tasks accounts for such a

limitation, as does confirmation from the VE that the identified jobs were the kind that could be

performed at Shoemaker's own pace.  Thus, the ALJ's conclusion that the RFC accounts for

Shoemaker's work limitations is supported by the record.  Although Shoemaker demands a

different reading of the record, the ALJ gave specific and legitimate reasons supported by

substantial evidence in the record to justify his decision.

II.    Shoemaker's Credibility

Shoemaker testified he can lift 10 pounds frequently and 20 pounds occasionally so long

as he can take his time and sit down.  He thought he probably would not have been able to get or

keep the job he held the longest if he had not been working with his father.  He avoided people

and thought he would have trouble if someone other than a family member supervised him.  On

days when he is in more pain, he finds himself walking around and lying down.  He can sit for an

hour if permitted to shift his position back and forth.  He can stand for about 30 minutes before

needing to sit for 10 or 15 minutes before standing again.  He can walk about 15 minutes before
he needs to sit.  He testified he can no longer work because he does not communicate with people
well and his back pain limits the things he can do.

The ALJ concluded Shoemaker's testimony about the intensity of his pain was not
supported by the medical record.  In addition, Shoemaker's daily activities, such as performing
self-care, shopping, cleaning the house, preparing meals, and working beyond his onset date of
disability, suggests he is capable of more activity than he testified to.  The ALJ believed
Shoemaker's testimony about his inability to hunt and fish was inconsistent with Shoemaker's
father's report that Shoemaker fished a couple of times per month.  Shoemaker had also informed
a nurse in early 2011 that the Percocet helped him feel comfortable enough to fish.  The ALJ
finally commented that Shoemaker worked beyond his onset date and that he received
unemployment benefits.

When deciding whether to accept the subjective symptom testimony of a claimant, the
ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective
medical evidence of one or more impairments which could reasonably be expected to produce
some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The
claimant is not required to show that the impairment could reasonably be expected to cause the
severity of the symptom, but only to show that it could reasonably have caused some degree of
the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the
claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically
identify the testimony she or he finds not to be credible and must explain what evidence
undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General

Page 18 - OPINION AND ORDER

findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The ALJ was correct to note the objective medical evidence does not fully support the level of impairment Shoemaker complains of. Dr. Glassman performed a thorough examination of Shoemaker's physical functional abilities and concluded he can work with some weight and sitting/standing limitations. Additionally, Shoemaker testified himself that the weight limits were fair and that he can pick objects off the floor for a "couple of hours." Tr. 83. Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

With respect to Shoemaker's daily activities, Shoemaker reported spending his days checking on his plants, watching television, visiting a friend or a family member, cleaning his house a little, and playing on the computer a little bit. He reported he is able to spend 5 minutes to 45 minutes preparing meals, although he mostly eats sandwiches and small meals. He can do his laundry, take the garbage out, do the dishes and mow. He was able to work during the summer of 2009, after his onset date of disability, babysitting two older children for six hours a day. These activities are sufficiently inconsistent with Shoemaker's complaints of pain to meet the clear and convincing standard.

Page 19 - OPINION AND ORDER

Shoemaker points to his report that it is difficult to bathe and dress, suggesting he is unable to do these things due to pain.  To the contrary, Shoemaker most recently told Dr. Eckstein he did not bathe because he had no motivation to do so.  The remaining concerns are accounted for in the RFC.  For example, the ALJ limited Shoemaker to standing four hours in a day, but only for 15 to 30 minutes at a time, and limited him to working with only two or three other people performing simple, routine tasks.  Further, the ALJ confirmed that the jobs identified by the VE could be performed by someone performing at his own pace.  Indeed, as the Commissioner notes, for the most part the ALJ accommodated Shoemaker's testimony about his limitations.

It is true the ALJ overstated the extent of Shoemaker's hunting and fishing activities.  His father's third party function report is somewhat ambiguous, but the ALJ's reading is not a fair one.  When asked what Shoemaker's hobbies are, his father answered hunting, fishing, and camping.  When asked how often Shoemaker does these things, his father answered "maybe once or twice a month."  But, when asked to describe the changes in these activities, Shoemaker's father answered that Shoemaker hurts too much, so he only goes maybe "one or two time[s] a year." Tr. 302.  Similarly, Shoemaker's one-time statement to the nurse that he was able to go fishing once he started the Percocet does not signal a trajectory toward improvement.  Finally, the Commissioner does not defend the part of the ALJ's analysis which relied on Shoemaker's receipt of unemployment benefits.

The fact that the ALJ improperly considered some reasons for finding plaintiff's credibility undermined does not mean that the ALJ's entire credibility assessment is improper. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004).  The ALJ's

conclusion that Shoemaker could perform light work with the limitations he described, and his rejection of Shoemaker's testimony to the contrary, is supported by specific, clear and convincing reasons, particularly where the ALJ accepted so much of what Shoemaker said.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___2nd___ day of September, 2015.


    /s/ Garr M. King
Garr M. King
United States District Judge